UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                            :

BEVERLY TILLERY,                       :        1:24-CV-7510

             Plaintiff,        :        ECF Case

             - against -       :

NEW YORK CITY GAY AND LESBIAN   :       **COMPLAINT**
ANTI-VIOLENCE PROJECT, INC., STEPHANIE :   **AND JURY DEMAND**
K. BLACKWOOD, OLIVIA BLAKE, DAVID   :
EHRICH, BEN LEE, LINDA TEPEDINO,    :
and PAMELA WILKINSON,           :
                                   :
                                   :
           Defendants.      :
                                   :
                                   :
-----------------------------------------------------------------x

       Plaintiff Beverly Tillery ("Tillery"), by her attorneys, Bantle & Levy LLP, as and for her

Complaint against Defendants New York City Gay and Lesbian Anti-Violence Project, Inc.

("AVP" or the "Organization"), and Stephanie K. Blackwood ("Blackwood"), Olivia Blake

("Blake"), David Ehrich ("Ehrich"), Ben Lee ("Lee"), Linda Tepedino ("Tepedino"), and Pamela

Wilkinson ("Wilkinson") (collectively, "Individual Defendants"), alleges as follows:

## NATURE OF THE ACTION

       1.     This is an action for breach of contract; employment discrimination based on race

in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"),

the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. (the "NYSHRL"), and the

New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. (the "NYCHRL");

unpaid wages in violation of New York Labor Law § 193 (the "NYLL"); and retaliation in

violation of Section 1981, the NYSHRL, the NYCHRL, and the NYLL.  Plaintiff seeks
declaratory relief and damages.

2.      Plaintiff Tillery, an accomplished non-profit leader with over three decades of
experience advocating for social, racial, and economic justice, commenced employment as
Executive Director of AVP in October 2015.  Tillery is the first Black woman to lead AVP and
the longest tenured Executive Director in the organization's history.

3.      Tillery has been an effective leader of AVP during a challenging time for the
organization and for the LGBTQ community.  She began as Executive Director at a time when
AVP was still recovering from the 2008 recession, in debt to various parties and without a
finance director, and through careful stewardship brought financial stability to the organization.
She also led AVP through the COVID-19 pandemic, from which it again emerged in a stable
financial position, due in large part to Tillery's leadership.

4.      As Executive Director, Tillery has been a visionary leader for the LGBTQ
community, which has faced grave challenges during her tenure that strike at the heart of AVP's
mission, including a rise in hate crimes targeting the LGBTQ community, and a national
movement against police violence implicating the safety of LGBTQ people around the country.
Through her effective financial stewardship and moral leadership, Tillery earned the respect of
AVP's staff, clients, donors, LGBTQ community leaders, and local, state and national political
leaders.

5.      Despite Tillery's strong track record and diligent service to AVP, in recent years,
Tillery has been subject to a campaign of baseless criticism and mistreatment from AVP's Board
of Directors (the "Board").  Since 2022, the Board has undergone a transition, with people of
color and non-profit-focused Board members leaving, and an influx of more politically

conservative, predominantly white Board members with little relevant non-profit experience and tepid commitment to AVP's programs and long-held values.  Due to her race and her advocacy for herself and other marginalized community members, Tillery encountered distrust from this new crop of Board members, who exhibited unwarranted antagonism toward Tillery and unjustified challenges to her competence as Executive Director, particularly pertaining to programmatic and financial matters.   On several occasions, Board members treated Tillery with outright hostility, specifically when Tillery advocated for organizational support of more progressive and inclusive efforts that reflected the needs and concerns of the city's diverse LGBTQ populations.  Tillery also raised concerns about the discrimination she herself faced from the Board, which triggered an escalation in Board members' distrust and resentment of Tillery.

6.     To undermine and circumvent Tillery, without legitimate cause, the Board sought greater control over AVP's finances, committing blunders that harmed AVP financially.  Upon realizing that AVP was experiencing financial challenges typical for a non-profit organization, the Board took overreactive measures that exacerbated AVP's financial problems, including ceasing all fundraising, communicating publicly that the organization was in dire straits, and failing to fill positions which are required to fulfill grant obligations.

7.     In furtherance of Board members' enduring racial and retaliatory animus toward Tillery, the Board greatly exaggerated AVP's financial problems and unjustifiably blamed Tillery for those problems.  The Board terminated Tillery *twice* – once (temporarily) in July 2023, in the middle of negotiating her contract for that year, and again in April 2024, three months before the end of her contractual term, citing false and unsupported allegations that Tillery had engaged in financial mismanagement.

3

8.     The Board's mismanagement of AVP with regards to its finances and programming, its mistreatment and unjustified termination of Tillery, and its continuing failure to act in the best interests of the Organization have caused an outcry among staff members (current and former), clients, donors, and leaders of both the local and national LGBTQ community. Many have called for the resignation of all members of the current Board.

9.     As set forth in detail below, the Board's decision to terminate Tillery's employment in April 2024 violated her contract and was motivated by racially discriminatory and retaliatory animus.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. § 1331.

11.     This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as her Section 1981 claims.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the asserted claims occurred herein.

## PARTIES

13.     Tillery is a resident of the State of New York and currently resides in New York, New York.

14.     AVP is a renowned 44-year old organization that empowers lesbian, gay, bisexual, transgender, queer, and HIV-affected communities and allies to end all forms of violence through organizing and education. AVP also supports survivors of violence through counseling and advocacy.

15.     AVP is a domestic not-for-profit organization headquartered at 116 Nassau Street, New York, New York 10038.

16.     At all times relevant herein, AVP was Tillery's employer within the meaning of the NYSHRL, N.Y. Exec. L. § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

17.     Stephanie K. Blackwood joined AVP's Board in September 2022.  At the time of Tillery's termination, Blackwood served as Board Chair.  Upon information and belief, Blackwood resides in New York.

18.      Olivia Blake joined AVP's Board in November 2023.  At the time of Tillery's termination, Blake served as Board Secretary.  Upon information and belief, Blake resides in New York.

19.     David Ehrich joined AVP's Board in February 2024.  At the time of Tillery's termination, Ehrich served as a Board member.  Upon information and belief, Ehrich resides in Vermont.

20.     Ben Lee joined AVP's Board in June 2020.  At the time of Tillery's termination, Lee served as Chair of the Board's Audit Committee.  Upon information and belief, Lee resides in New York.

21.     Linda Tepedino joined AVP's Board in November 2023.  At the time of Tillery's termination, Tepedino served as a Board member.  Upon information and belief, Tepedino resides in New York.

22.     Pamela Wilkinson joined AVP's Board in September 2022.  At the time of Tillery's termination, Wilkinson served as Board Treasurer.  Upon information and belief, Wilkinson resides in New York.

## STATEMENT OF FACTS

**Tillery is Hired and Successfully Guides AVP Through Turbulent Times**

23.    In October 2015, the Board of AVP (which had an entirely different membership than the current Board) hired Tillery into the position of Executive Director.

24.    To date, Tillery is the longest tenured Executive Director in AVP's history and the only Black woman ever to serve as Executive Director.

25.    Since 2015, Tillery has guided AVP through programmatic and financial challenges.

26.    At the time she was hired, AVP was still recovering from long-lasting effects of the 2008 recession, and was in debt to its landlord and other vendors and entities.

27.    Initially, one of the biggest challenges Tillery faced in stabilizing AVP financially was that its heavy reliance on government funding, disbursement of which is typically delayed, caused chronic cash flow issues.

28.    AVP typically waits as long as a year after performing funded work to receive New York City grant money.  This is typical for grant recipients of New York City government funding; government grants are generally reimbursed grants, meaning that a recipient must perform the work for which funding is approved before receiving the funds.

29.    Accordingly, AVP experienced cash shortages each year as it waited for grant money to be disbursed.

30.    In or about 2016, to mitigate these cash flow challenges, Tillery established a reserve fund to serve as an internal line of credit, with specific rules governing when AVP could access reserve funds and requiring that withdrawn funds be replaced.

31.    By 2021, under Tillery's leadership, AVP had grown its reserve fund to about $500,000, enabling a degree of financial stability for the organization that had not been feasible in the past.

32.    Today, AVP is still dependent on government grants, so some cash flow issues persist, but these issues are now more manageable due to Tillery's establishment of the reserve fund.

33.    In addition to delivering AVP through these financial challenges and creating financial infrastructure for AVP's future financial health, Tillery also guided AVP through challenges posed by the COVID-19 pandemic.

34.    Tillery's notable accomplishments of leadership during the pandemic include her fundraising efforts, as she was able to both qualify AVP as a Black-led organization and unlock access to various private donors, including the wealthy philanthropist Jack Dorsey, who made a $1.75M donation in 2020.  While the pandemic was generally a harrowing time for non-profit organizations financially, AVP impressively emerged in a stable financial position, thanks to Tillery's leadership and acumen.

35.    Tillery's tenure also coincided with a challenging time for the LGBTQ community, during which she led AVP to take bold advocacy positions in line with AVP's mission to create systemic change while utilizing an anti-oppressive practice.[1]

---

[1] *See* "Mission, Vision, & Goals," Anti-Violence Project, https://avp.org/about-us/mission-vision-goals/ ("AVP is committed to performing all of its work through an anti-oppression lens. Another cornerstone of the work of the strategic plan is to integrate an anti-oppression analysis throughout the organization."); *see also* "What is Anti-Oppression?," Anti-Violence Project, https://www.antiviolenceproject.org/anti-oppressive-practices/ ("Anti-Oppression work seeks to recognize the oppression that exists in our society and attempts to mitigate its affects and eventually equalize the power imbalance in our communities.").

36.     Among other crises, since 2015, there has been a rise in hate crimes and violence against LGBTQ people, particularly LGBTQ people of color and Black transgender women.[2]

37.     A societal movement challenging police violence has also acutely affected the LGBTQ community, particularly its minority, immigrant, and transgender and gender non-conforming members.[3]

38.     In addition, following the Trump Administration's crackdown on immigration, LGTBQ asylum seekers have needed increased non-profit assistance.[4]

39.     Throughout these challenges, Tillery successfully oversaw an expansion of AVP's advocacy and services in these and other areas, on a local and national scale.

**A Newly Constituted and Inexperienced Board Treats Tillery with Distrust and Hostility**

40.     Beginning around 2022, after some Board members departed and new members were appointed, a Board emerged whose members lacked relevant backgrounds in social justice movements, non-profit management, and lived experiences related to LGBTQ anti-violence

---

[2] *See* "A Crisis of Hate: A Report on Lesbian, Gay, Bisexual, Transgender and Queer Hate Violence Homicides in 2017," National Coalition of Anti-Violence Programs (2018), https://avp.org/wp-content/uploads/2018/01/a-crisis-of-hate-january-release-12218.pdf, at 6-7 (documenting that "[i]n 2017, NCAVP recorded reports of 52 hate violence related homicides of LGBTQ people, the highest number ever recorded by NCAVP," and that "[o]f the total number of homicides in 2017, 71% of the victims were people of color").

[3]  *See* "AVP's Vision for Community Safety at Pride," Anti-Violence Project (June 17, 2021), https://avp.org/2021/06/17/avps-vision-for-community-safety-at-pride/ ("The NYPD has a long history of harassing, arresting, and being violent toward members of the LGBTQ and HIV-affected community . . . The police's violence and targeting have particularly harmed LGBTQ people in Black communities, indigenous communities, and undocumented immigrant communities, especially transgender and gender non-conforming people.").

[4] *See, e.g.*, "Anti-Violence Project Client Gia Has Been Granted Asylum," Anti-Violence Project (Sep. 25, 2018), https://avp.org/2018/09/25/anti-violence-project-client-gia-has-been-granted-aslyum/.

work.  The new Board elected a majority of white officers.  In 2023, after the renegotiation of Tillery's contract, more Board members resigned, resulting in a predominately white Board with limited relevant experience.

41.     Specifically, many of the new Board members (*i.e.,* those joining the Board in 2022 or subsequently) were not accustomed to the cash flow issues that result from characteristic delays in receipt of government, and particularly City government, grant funds.  This was particularly true of Wilkerson, who was appointed Treasurer in June 2023.

42.     Most of the new Board members were also largely unfamiliar with AVP programs and activities.  Despite this inexperience, the new members did not take the steps necessary to learn about the core programs and activities of AVP.

43.     The new Board members rarely, if ever, attended AVP programs, such as trainings, community outreach events, meetings, and rallies.

44.     One of the most important AVP programs is its 24-hour bilingual hotline for people to call when they are in crisis, having experienced or witnessed violence or other violence-related trauma, and/or thoughts of suicide.

45.     None of the new Board members ever attended the training for volunteers to handle hotline calls, which occur two or three times each year.

46.     The new Board members evidenced disinterest in the very organization that they were supposed to be serving.

47.     The lack of involvement of the new Board members in AVP programs and activities caused many AVP staff members to lose respect for and distrust them.

48.     Although Tillery was prepared and well-positioned to educate and guide the Board, as she had previously done, a skeptical and antagonistic attitude from the Board toward

Tillery, including around Tillery's management of the Organization's finances, began inhibiting the productive flow of information that had previously occurred between Tillery and the Board.

49.     Upon information and belief, the Board discriminated against Tillery when making the baseless determination that she was not sufficiently knowledgeable regarding the organization's finances despite having successfully guided the organization through financial challenges for years.

50.     Though many of the new Board members lacked relevant non-profit experience, specifically regarding non-profits like AVP that are reliant on government grants, the Board's distrust of and racial animosity toward Tillery led the Board to undermine her leadership in financial matters, seizing more direct control over AVP's finances than past boards had exercised.

51.     Upon information and belief, Jim O'Sullivan, a long-time Board member who was appointed Co-Chair in 2022, began fomenting the animosity toward Tillery once he became Co-Chair.

52.     O'Sullivan began deliberately undermining Tillery and discrediting her competence to other Board members and organization staff.

53.     For example, O'Sullivan developed a practice of contacting white staff members working under Tillery to seek information relevant to AVP's finances, rather than seek that information directly from Tillery, as the Board had in the past.

54.     In the summer of 2022, he contacted the Development Director, Sarah Murphy, a white woman, to obtain information about funds from government grants.

55.     O'Sullivan led her to believe that he sought the information to help with the Board's fundraising activities; but as it turned out, he sought this information as support to level accusations against Tillery of mismanaging government grant money.

56.     The data itself reflected routine delays in government grant money, which Tillery had previously explained, but O'Sullivan ultimately misrepresented the data to other Board members as evidencing a discrepancy between the amount granted and the amount received.

57.     When eventually presented with this discrepancy, Tillery attempted to educate the members of the Board, but they were resistant to her rationale and objectively accurate explanation.

58.     Starting in the fall of 2023, the Board began refusing to fundraise for any purpose, insisting that it was not a Board responsibility, even though fundraising is a quintessential Board responsibility and was undertaken successfully by prior AVP boards.

59.     Owing to the Board members' failure to fundraise, AVP's annual fundraising gala in 2023 was unsuccessful, thereby worsening AVP's cash flow issues.

60.     The Board's willful ignorance to the needs of AVP and refusal to follow Tillery's guidance also led to the Board taking overreactive measures that further worsened AVP's financial challenges.

61.     For example, based on a wrongheaded concern about the cost of reserving space for the annual gala, combined with skepticism and unwillingness to fundraise for the event, the Board decided in February 2024 to cancel the 2024 annual fundraising gala, despite Tillery's expressed concern and insistence on an alternative fundraising plan which was never developed by the Board.

62.    In addition, Board members falsely began communicating to staff that the organization was not fiscally viable or solvent.

63.    This messaging by the Board had the effect of scaring staff and causing valuable AVP employees to begin looking for other jobs.

64.    In a misguided overreaction in the Spring of 2024, the Board even began exploring ways to shut the organization down or to merge it with another organization.

65.    Every fiscal year, in a process beginning in the fall, AVP undergoes an audit, which involves AVP's finance team working with the Audit Committee of the Board and an outside auditor to prepare an auditor's report.

66.    In March 2024, during the audit process for fiscal year 2023, after the auditors completed their work and presented an unqualified, or clean, audit to the Board for their approval, the Audit Committee and Executive Committee of the Board held secret meetings with the auditors (without Tillery or other staff present) to attempt to convince the auditor to change the unqualified opinion to a qualified opinion. As a result of the Board's actions, the Organization was forced to file its financial statements past the deadline, and the auditor placed a note in the financial statements indicating doubt about AVP's ability to continue as a "going concern."

67.    Prior to the release of the fiscal year 2023 financial statements, Tillery and AVP staff worked extensively with the auditor to analyze AVP's financial data, and during this time, Tillery and staff developed a forward-looking budget and operating plan which included cost-cutting measures, increased fundraising, and strategies to expedite government funding.

68.     In the 2023-2024 fiscal year, Tillery cut AVP's budget from $5.5 million to $4.3 million, including by terminating four staff members and not filling some open positions, measures for which Board members thanked her on multiple occasions.

69.     But the Board continued to abdicate its fundraising responsibilities and to communicate to donors and funders that AVP was not fiscally viable, further compounding the financial difficulties which existed for the Organization.

70.     Parallel to this dynamic between Tillery and the Board regarding AVP's financial issues, tensions between Tillery and the Board grew over racial issues as well.

71.     Members of the new Board that emerged in 2022 were generally uninterested in issues relevant to LGBTQ people of color, regardless of how central they had been historically to AVP's mission, and did not understand or support the anti-oppressive and anti-racist principles underlying AVP's work.[5]

72.     For example, in the wake of the national wave of protests against systemic police violence and racism in 2020, including protests over the murder of George Floyd, Tillery and AVP staff favored advocacy positions consonant with the goals of the police reform movement, including restricting police presence at Pride demonstrations, while the Board generally favored a stance more supportive of police.

73.     Similar divisions emerged over other issues disproportionately affecting LGBTQ people of color, including ending solitary confinement, shutting down the Rikers Island jail, Bail Reform, and AVP's support for reducing police involvement in mental health crisis situations after the tragic police shooting of Kawaski Traywick.

---

[5] *See supra* note 1.

74.     While Tillery consistently supported AVP's advocacy in these areas as aligned with the organization's mission, Board members sometimes criticized her in meetings for championing such causes, and expressed that Tillery should keep AVP's progressive staff members under control for public relations reasons.

75.     As part of Tillery's leadership of AVP, she ensured that the Organization was actively involved with organizations representing the interests of LGBTQ people of color, such as the NYC Black Pride group and the National Black Justice Coalition.

76.     In the spring of 2023, Tillery was honored by both of these organizations at public events. The AVP Board was indifferent to the recognition given to Tillery. Not a single Board member attended either event.

77.     As he had done on financial matters, O'Sullivan undermined Tillery's authority on AVP communications by disrespecting her and Orie Givens, the Black Communications Director.  O'Sullivan and other board members demanded to review statements from AVP before they were released and made demands regarding public relations messaging.

78.     In addition, other Board members, including Blackwood and Tepedino, began relying on the information provided by Audacia Ray, AVP's white Director of Community Organizing and Public Advocacy, rather than relying on Tillery.

79.     In addition to undermining Tillery, O'Sullivan routinely behaved in a confrontational and dismissive way towards Tillery at meetings of the Board and the Board's Executive Committee, prompting Tillery to raise concerns about disparate treatment.

80.     For example, in one meeting, he cut off a conversation between Tillery and other Board members to exclaim that he "gave up" another activity he planned for the day in order to attend the meeting, suggesting that Tillery was wasting his time.

14

81.     In another Board meeting, in which Tillery proposed investing more in national advocacy work, opining that AVP could support these efforts by seeking more funds from donors outside of New York, O'Sullivan interrupted her and began yelling at her in a humiliating and disrespectful way.

82.     Wilkerson was also disrespectful and confrontational with Tillery despite Wilkerson's lack of knowledge and expertise about running a not-for-profit LGBTQ organization.

**Tillery Complains and Objects to Discriminatory Treatment, and the Board Retaliates**

83.     Beginning in 2022, Tillery began objecting to O'Sullivan's discriminatory treatment toward her, including his practice of speaking disrespectfully to her and undermining her by seeking information from the white employees Tillery supervised.

84.     Specifically, Tillery had numerous conversations with other Board members regarding her concerns, including then-chair Elizabeth Edman, in which Tillery objected to O'Sullivan's disrespectful conduct and asked that Edman speak with him to address the issue.

85.     In a June 2023 Board meeting regarding transition planning for Tillery's departure, including a discussion of the terms of her final contract, Tillery raised concerns about the racially motivated mistreatment toward her by the Board.

86.     There were a number of issues on which the Board and Tillery were negotiating in order to arrive at a final contract.  One dispute was over whether AVP would provide Tillery with severance pay at the time of her eventual departure.

87.     In support for her requested severance pay, Tillery provided the Board with examples of white Executive Directors, including white male Executive Directors of LGBTQ

advocacy organizations, who had recently received comparable severance payments under similar circumstances.

88.     O'Sullivan ignored Tillery's presentation of comparators and was instead openly hostile to her position in the negotiations.

89.     In light of the conflicts and hostility that she was experiencing at Board meetings, Tillery opined that the Board would not be treating her this way "if she were a white man."

90.     Upon information and belief, the Board was angered by Tillery's assertion of racially-based treatment.

91.     Shortly thereafter, in July 2023 – in the midst of the ongoing contract negotiations – the Board abruptly terminated Tillery's employment.

92.     Tillery's counsel in the contract negotiations then wrote to the Board's attorney that the termination was racially discriminatory and retaliatory.

93.     Thereafter, the Board retracted its abrupt termination of Tillery's employment and contract negotiations resumed.

94.     Tillery's new contract was fully executed on August 14, 2023 (the "2023 Contract").

95.     Shortly thereafter, O'Sullivan resigned from the Board, though he continues to be involved with AVP in other capacities and, upon information and belief, continues to speak with and advise current Board members.

96.     Although ultimately reinstating Tillery and awarding her a new contract, the Board resented Tillery's allegation that she was being subjected to discrimination and retaliated against.

97.     At a subsequent Board meeting, one or more Board members expressed the view that Tillery had held them up for ransom.

**Defendants Terminate Tillery in April 2024 in Violation of Her Contract**

98.     The 2023 Contract specified that Tillery would continue employment as Executive Director until July 31, 2024 at a salary of $200,000 per year, unless AVP terminated her "for any basis that would constitute a termination for cause under common law or for material breach" of the contract.

99.     In addition to employment through July 31, 2024, the contract also specified that Tillery would be entitled to various payments and benefits upon her July 31, 2024 separation, or upon termination prior to that date for any reason other than cause or her material breach, including: (a) two months' pay at her base salary, in lieu of a paid sabbatical, which she had earned under AVP policy; (b) six months' pay at her base salary, as severance pay; (c) COBRA expenses through the earlier of March 2025 or her coverage under a new employer's health care plan; and (d) reimbursement for coaching or outplacement services.

100.     Despite having agreed to increase Tillery's salary to $200,000, the Board never took steps to pay her the increased amount despite Tillery raising the issue to Blackwood on at least two occasions.

101.     On April 25, 2024, the Board summoned Tillery to a meeting and terminated her, effective immediately.

102.     Upon information and belief, one of two Black members of the Board in 2024, Sharon Huffman, supported the continued employment of Tillery, believing that Tillery, who had successfully guided the organization for 8 ½ years, should be given more respect and deference by the Board members who were far less knowledgeable about running AVP than she.

103.    Huffman resigned her position on the Board before the Board made a decision to terminate Tillery's employment.

104.    The only other Black member of the Board, Kito Huggins, also resigned at about the same time.  Upon information and belief, Huggins resigned upon learning that Huffman had resigned.

105.    The Board never disclosed to AVP staff that both of its Black members had resigned.

106.    The principal reasons the Board provided in support of the termination decision were Tillery's alleged financial mismanagement and lack of transparency surrounding finances.

107.    However, Tillery had not mismanaged the organization's finances, nor had she withheld information from the Board.

108.    In reality, it is *the Board* – not Tillery – that had mismanaged AVP's finances and damaged the organization's reputation and ability to fundraise.

109.    Among other things, the Board disregarded its own rules for use of the reserve fund, which had been built up during Tillery's tenure.

110.    The termination, which was premised on false allegations against Tillery motivated by racially discriminatory and retaliatory animus, lacked a legitimate basis and was a termination without cause.

111.    Though no objective support or financial data was provided by the Board in support the termination of Tillery's employment, presumably the Board was relying on the same cash flow shortage due to lags in City government funding that Tillery had previously explained to the Board in an attempt to ameliorate the Board's concerns.

112.    Moreover, although the Board alleged at the time of Tillery's termination that AVP may need to immediately shut down due to a lack of available funds to cover payroll, on information and belief, as of the date of Tillery's termination, AVP had approximately $800,000 in its bank account, which provides sufficient funds to cover payroll, AVP's main expense, and had a cash flow analysis that showed additional funds that were to be received for the foreseeable future.

113.    Moreover, AVP was on track to receive many more grants and donations in the coming months at the time of Tillery's termination.

114.    Both the Board members' racially-motivated disrespect of Tillery and their inexperience with cash flow issues characteristic of a City government-funded non-profit led to the Board's overestimation of AVP's financial troubles.

115.    In addition, contrary to the Board's exaggerated claims of financial hardship, the auditor's report issued in May 2024 did not reveal evidence of financial mismanagement by Tillery.

116.    At the time of termination, Tillery had been continuing to work in the best interests of the organization and was making progress through the LGBTQ caucus of the City Council, a longtime supporter of AVP, to hasten the delivery of delayed City government grants.

117.    Despite lacking cause for her abrupt termination, Defendants did not provide Tillery with the back pay owed her,[6] remaining three months of her salary, sabbatical pay, severance pay, outplacement services, or COBRA expenses, as the August 2023 contract required.

---

[6] Months after Plaintiff asserted her rights to back pay owed, Defendants sent Plaintiff $5,309.03, purportedly as compensation for back pay owed, but this amount was less than the total owed.

118.     After terminating Tillery, the Board replaced her with John Keefe, a white man with no experience in LGBTQ advocacy.

119.     Upon information and belief, Keefe has been wholly unsuccessful in fundraising for AVP because he lacks the knowledge, contacts, and experience to successfully fundraise from the LGBTQ community and its supporters.

120.     Subsequent to Tillery's termination, numerous key employees of AVP have resigned their positions, further exacerbating the problems that the current Board has caused for AVP.

121.     Upon information and belief, these key staff members have resigned in response to Tillery's wrongful discharge and because the Board has mismanaged AVP in many ways, large and small.

122.     Upon information and belief, a hard-working Black volunteer who was assisting AVP on financial matters as a member of the Finance Committee recently quit her role in the Organization because of her belief that she was disrespected by current Board members due to her race.

123.     Tillery's race, and her opposition to discriminatory treatment from the Board, were motivating factors in Defendants' decision to terminate her employment.

124.     Defendants' actions described above were undertaken willfully, intentionally, maliciously and with reckless indifference to Tillery's protected rights.

125.     Upon information and belief, Tillery faced undue and baseless criticism regarding the financial management of AVP due to her race.

126.    Upon information and belief, Tillery was treated less favorably in her role by O'Sullivan and current board members, who preferred to engage with white staff members and Board members over Tillery regarding the organization's financial stability.

127.    The Board's decision to terminate Tillery's employment was motivated by her race, her opposition to the discrimination against her, and her outspoken advocacy for the diverse and marginalized communities benefiting from AVP's programs.

128.    The Board was also motivated to remove Tillery because they had stereotypical views of Black people which caused them to wrongly believe that Tillery was less capable and trustworthy than other executive employees who are not Black.

129.    Tillery was subjected to differential and adverse treatment by Defendants on the basis of her race.

130.    As a result of Defendants' discriminatory and retaliatory termination of Tillery, she was denied income and benefits and has sustained severe mental and emotional harm and distress.

**FIRST CAUSE OF ACTION**
***Discrimination on the Basis of Race in Violation of 42 U.S.C Section 1981***
***Against AVP***

131.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

132.    As a result of the aforesaid acts, AVP discriminated against Plaintiff on account of her race in violation of 42 U.S.C. Section 1981 by terminating her employment because of her race.

133.    As a result of AVP's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment

opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SECOND CAUSE OF ACTION
### *Retaliation in Violation of 42 U.S.C. Section 1981*
### *Against AVP*

134.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

135.    As a result of the aforesaid acts, AVP retaliated against Plaintiff for opposing discrimination in the workplace in violation of 42 U.S.C. Section 1981 by terminating Plaintiff's employment in retaliation for her protected activity.

136.    As a result of AVP's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## THIRD CAUSE OF ACTION
### *Discrimination on the Basis of Race in Violation of the NYSHRL*
### *Against all Defendants*

137.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

138.    As a result of the aforesaid acts, Defendants discriminated against Plaintiff on account of her race in violation of the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq*., including § 296(1)(a), by terminating Plaintiff's employment because of her race.

139.    As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### FOURTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling and Coercing Discrimination on the Basis of Race*
*in Violation of the NYSHRL*
*Against the Individual Defendants*

140. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

141. As a result of the aforesaid acts, the Individual Defendants aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq*., including § 296(1)(a), in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296(6). Specifically, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced discrimination against Plaintiff based on her race.

142. As a result of the Individual Defendants' unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### FIFTH CAUSE OF ACTION
*Retaliation in Violation of the NYSHRL*
*Against all Defendants*

143. Plaintiff repeats and realleges the allegations above as if fully set forth herein.

144. As a result of the aforesaid acts, Defendants retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York State Human Rights Law, N.Y. Exec. L. §§ 296(7), by terminating Plaintiff's employment in retaliation for her protected activity.

145. As a result of Defendants' retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

23

## SIXTH CAUSE OF ACTION
### *Aiding, Abetting, Inciting, Compelling and Coercing Retaliation*
### *in Violation of the NYSHRL*
### *Against the Individual Defendants*

146.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

147.    As a result of the aforesaid acts, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York State Human Rights Law, N.Y. Exec. L. §§ 296(7), in violation of the New York State Human Rights Law, N.Y. Exec. L. § 296(6).  Specifically, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced retaliation against Plaintiff in retaliation for her protected activity.

148.    As a result of the Individual Defendants' unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SEVENTH CAUSE OF ACTION
### *Discrimination on the Basis of Race in Violation of the NYCHRL*
### *Against all Defendants*

149.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

150.    As a result of the aforesaid acts, Defendants discriminated against Plaintiff on account of her race in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., including § 8-107(1)(a), by terminating Plaintiff's employment because of her race.

151.    As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## EIGHTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling and Coercing Discrimination on the Basis of Race*
*in Violation of the NYCHRL*
*Against the Individual Defendants*

152.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

153.    As a result of the aforesaid acts, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., including § 8-107(1)(a), in violation of § 8-107(6). Specifically, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced discrimination against Plaintiff based on her race.

154.    As a result of the Individual Defendants' unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## NINTH CAUSE OF ACTION
*Retaliation in Violation of the NYCHRL*
*Against all Defendants*

155.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

156.    As a result of the aforesaid acts, Defendants retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7), by terminating Plaintiff's employment in retaliation for her protected activity.

157.    As a result of Defendants' retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## TENTH CAUSE OF ACTION
### *Aiding, Abetting, Inciting, Compelling and Coercing Retaliation*
### *in Violation of the NYCHRL*
### *Against the Individual Defendants*

158.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

159.    As a result of the aforesaid acts, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced acts forbidden under the New York City Human Rights Law, in violation of N.Y.C. Admin. Code § 8-107(6) and § 8-107(7).  Specifically, the Individual Defendants have aided, abetted, incited, compelled, and/or coerced retaliation against Plaintiff in retaliation for her protected activity.

160.    As a result of the Individual Defendants' unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## ELEVENTH CAUSE OF ACTION
### *Breach of Contract*
### *Against AVP*

161.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

162.    Plaintiff and AVP entered into a contract in August 2023 (the "2023 Contract")

163.    The 2023 Contract specified that Plaintiff would be employed as Executive Director until July 31, 2024 at a salary of $200,000 per year, unless AVP terminated her "for any basis that would constitute a termination for cause under common law or for "material breach" of the contract.

164.    Despite the entry of the 2023 contract, AVP breached the contract by failing to pay Tillery her increased salary of $200,000 from August 2023 to April 2024, later issuing a

26

payment to Plaintiff months after wrongfully terminating her employment for some but not all of this owed backpay.

165.    The 2023 Contract also specified that Plaintiff would be entitled to the following payments and benefits upon her July 31, 2024 separation, or upon termination prior to that date for any reason other than cause or her material breach:

(a) two months' pay at her base salary, in lieu of a paid sabbatical;

(b) six months' pay at her base salary, as severance pay;

(c) COBRA expenses through the earlier of March 2025 or her coverage under a new employer's health care plan; and

(d) reimbursement up to $7,500 for outplacement or coaching services.

166.    On April 25, 2024, AVP further breached the 2023 Contract by terminating Plaintiff without cause, and before the end of her contractual term, without payment.

167.    As a result, Plaintiff has been damaged in an amount equal to the difference between the salary she was paid from August 2023 to April 2024 and the salary she was contractually entitled to, her salary for the period between April 25, 2024 and July 31, 2024, and the payments specified in paragraph 165 (a)-(d), along with pre- and post-judgment interest.

**TWELFTH CAUSE OF ACTION**
**NYLL § 193 - Unpaid Promised Wages**
**Against AVP**

168.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

169.    Defendant AVP failed to pay Plaintiff's wages and benefits, in accordance with the August 2023 contract – specifically, the increase in her rate of pay from August 2023 to April 2024 that Defendants failed to pay; her salary through the July 31, 2024 contractual termination date; two months' pay at her base salary, in lieu of a paid sabbatical; six months' pay at her base

salary, as severance pay; outplacement and coaching services; and COBRA expenses through the earlier of March 2025 or her coverage under a new employer's health care plan.

170.    Defendant had no reasonable grounds for believing their failure to pay these wages and benefits was not a violation of the NYLL.  Rather, Defendant's failure to pay them was willful within the meaning of NYLL.

171.    Plaintiff therefore is entitled to these unpaid wages and benefits, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

### THIRTEENTH CAUSE OF ACTION
#### *Retaliation in Violation of the NYLL*
#### *Against AVP*

172.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

173.    As a result of the aforesaid acts, Defendant AVP retaliated against Plaintiff for opposing unlawful actions in the workplace, in violation of the New York Labor Law § 740, by terminating Plaintiff's employment in retaliation for her protected activity.

174.    As a result of Defendant's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

### JURY DEMAND

175.    Plaintiff hereby demands trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that the Court grant judgment for Plaintiff and that it order and award Plaintiff the following relief against Defendants:

(1)    A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by 42 U.S.C. § 1981, as amended by

the Civil Rights Act of 1991, the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*., the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., the New York Labor Law, and the common law;

(2)    Reinstatement to the highest position to which Plaintiff was and would be entitled and/or front pay;

(3)    Compensatory damages in the form of:

a.    back pay with interest based on Plaintiff's appropriate compensation had she not been wrongfully terminated;

b.    the amount of underpaid salary from August 2023 to the date of termination;

c.    reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial;

d.    severance, sabbatical pay and other perquisites set forth in her 2023 Contract with AVP;

e.    damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial, but believed to exceed $100,000;

(4)    Punitive damages against the Individual Defendants in an amount not less than $100,000;

(5)    Statutory attorneys' fees, costs and disbursements;

(6)    Interest; and

(7)    Such additional relief to Tillery as the Court deems just and proper.

Dated: October 3, 2024
       New York, New York

                              BANTLE & LEVY LLP

                              /s/ *Lee F. Bantle*
                              Lee F. Bantle
                              Sherie N. Buell
                              Julio Sharp-Wasserman
                              99 Park Avenue, Suite 1510
                              New York, NY 10016
                              (212) 228-9666
                              *Attorneys for Plaintiff Beverly Tillery*